IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

**UTILITY CONSTRUCTION**
**SERVICES, L.L.C.**                                                                 **PLAINTIFF/COUNTER-DEFENDANT**

**v.**                                                                                            **CIVIL ACTION NO. 5:24-cv-00078-DCB-LGI**

**RICHARD ETHRIDGE, II,**
**CECILY LARUE ETHRIDGE, AND**
**TEMPEST ENTERGY, LLC**                                                 **DEFENDANTS/COUNTER-PLAINTIFFS**

**v.**

**ELMO ANDREW SOIGNET, III**                                      **COUNTER-DEFENDANT**

## ORDER

This matter is before the Court on Defendants/Counter-Plaintiffs Richard Ethridge, II and Cecily LaRue Ethridge's Amended Motion to Compel [153]. The Ethridges filed the instant motion, urging this Court to compel Plaintiff Utility Construction Services, LLC to produce certain communications from Attorney Janet Hendrick to Wendy Dufresne, CEO of Power Group Services. Doc. [154], Memorandum in Support of Motion to Compel. Utility Construction Services, LLC filed a Response in Opposition [165], arguing that attorney-client privilege protects the communications at issue, which "are between counsel for UCS and officers of UCS for the purpose of facilitating the provision of legal advice." Doc. [166] at 1, Memorandum to Response in Opposition. The Ethridges file no reply or rebuttal to their Amended Motion to Compel [153] and apparently rest on the arguments presented therein. This matter is ripe for ruling.

The Court, having considered the submissions, the record and relevant law, finds that the Amended Motion to Compel [153] is DENIED, as discussed below.

1

I.   **Factual Summary and Pertinent Background**

The following factual summary and background information make up the basis for the instant action and aids in understanding the discovery dispute currently before the Court.[1]

> This dispute arises out of alleged breaches of contracts relating to two separate business entities: Utility Construction Services ("Utility") and Power Group Services ("Power Group"). [ECF No. 1] ¶¶ 1, 12. The former entity is wholly owned by Mr. Soignet, while the latter was, at the time the complaint was filed, a certified Women-Owned Business Enterprise construction company with three members: Mr. Soignet, who owned 44%, and Mr. and Mrs. Ethridge, who owned 5% and 51%, respectively. *Id*. ¶ 13. On August 28, 2024, Mr. Soignet expelled the Ethridges from Power Group "on an unnamed 'cause' ground." [ECF No. 7] ¶ 3.
>
> In their third-party complaint against Mr. Soignet, the Ethridges allege in part that Mr. Soignet tortiously breached the Power Group Operating Agreement by expelling the Ethridges in bad faith. [ECF No. 3] ¶ 4.21. The Ethridges further allege that Mr. Soignet allowed the company's Women-Owned Business Enterprise certification to lapse in violation of Power Group's operating agreement. *Id*. ¶ 4.18. . . .
>
> [T]he Ethridges allege that Soignet breached the Power Group Operating Agreement by engaging "in a series of actions with the express purpose of stripping from PGS all of its revenue and profits for the benefit of UCS and himself. These acts are not in the best interest of PGS and thwart the very purposes for which the company was created and operated." [ECF No. 8] ¶ 3.3. These acts include expelling the Ethridges without cause in violation of the Operating Agreement, which requires a showing of "wrongful conduct including fraud, gross negligence, and intentional misconduct." *Id*. ¶ 3.8.
>
> Soignet argues that he expelled [t]he Ethridges as members of Power Group after concluding that they engaged in acts constituting cause under the Operating Agreement, and that under the agreement he was not required to provide them notice of the reasons for their termination. [ECF No. 73] at 7. The facts which support the Ethridges' claim are hotly contested, both in their counterclaim and in Utility's initial cause of action. Specifically, the parties disagree as to whether Soignet was aware of the profit percentage allocated to Power Group from the Pine Tree Project. Soignet claims that he "did not review or approve any PGS bid proposal or contract that allocated 38.5% of the total Pine Tree contract to PGS, which is the contract allocation that is the central issue in this case." [ECF No. 84] at 3.

---

[1] This portion of the factual summary and background were taken from District Judge Bramlette's previous Order, wherein the Court considered and ruled on the Ethridges' Emergency Motion for TRO and Preliminary Injunction [7]. *See* Order, Doc. [87] at 1-6 (denying Motion for TRO, denying Motion for Preliminary Injunction, Denying Motion for Hearing).

2

> [S]oignet claims he had cause to remove the Ethridges from Power Group because the actions Mr. Ethridge took regarding the Pine Tree Project were taken without complying with the Power Group Operating Agreement, and "he intentionally concealed his actions for his personal benefit." [ECF No. 73] at 7. Additionally, Soignet maintains that he held the majority in interest required to expel the Ethridges. *Id*. The Operating Agreement provides that "[a] member may be expelled from the Company for Cause upon a Majority in Interest vote of the Members (excluding the Member to be expelled)." [ECF No. 7-2] Section 4.12. There are only three members of Power Group, and, excluding the Ethridges ("the parties to be expelled"), Soignet holds a majority interest. [ECF No. 84] at 7-8.

Excerpts from Order, Doc. [87] at 1-6.

## II.     Recent Procedural History/Discovery Dispute

On June 4, 2025, Magistrate Judge Harris held a telephonic discovery conference with the parties regarding discovery disputes. *See* Minute Entry, dated 06/04/2025 ("As discussed on the call, Defendants shall produce the items requested and Plaintiff shall produce an updated privilege log by the end of the week. If Plaintiff is unsatisfied with Defendants' production, Plaintiff may file a motion to compel on June 9, 2025. Following receipt of Plaintiff's privilege log, Defendants may file a motion to compel as discussed on the call."). On July 3, 2025, Judge Harris recused, and this case was reassigned to the undersigned. *See* Order of Recusal [126].

On August 11, 2025, the Ethridges filed their initial Motion to Compel [147]. On August 12, 2025, the undersigned denied without prejudice, on procedural grounds, the Ethridges' first Motion to Compel [147]. *See* Text-only Order. However, after receiving email correspondence from the movants' counsel, the Court entered another Text-only Order, providing, "The Court, having been advised that the parties had a discovery conference with Judge Harris regarding the issues raised in Cecily LaRue Ethridge and Richard Ethridge, II's Motion to Compel [147], allows these Defendants to refile the motion to compel without further conference with the Court. The Court directs Defendants to supplement their previously filed motion to compel to include in their

3

filing a recitation of the facts surrounding their prior conferences with the other parties and the details of their discovery conference with Judge Harris." *See* Text-only Order, dated 08/15/2025.

On August 21, 2025, the Ethridges' filed the instant amended motion, providing additional details as to the procedural history of the subject discovery dispute. They summarized their prior conference with Judge Harris:

> [T]he parties had submitted short emails describing the issues concerning the Ethridge's position that the letter from Ms. Hendrick as counsel for either PGS or UCS was not protected by any attorney client privilege from disclosure to the Ethridge's and UCS' position that it was. Judge Harris ordered the production of a privilege log by UCS by the end of the week and allowed the Ethridges to file a motion to compel if unsatisfied with the assertion of privilege. Subsequently, UCS maintained that they did not think the letter had to be added to their privilege log because it was not specifically asked for in discovery. The Ethridges had asked for all documents pertaining to the efforts of Mr. Soignet, a party hereto, to control PGS independently of the [sic] Ms. Ethridge, PGS' majority owner. In an abundance of caution, the Ethridges served a new set of requests specifically asking for the letter itself and other communications pertaining to it.

Doc. [154] at 2, "Conference with Judge Andrew Harris".

### III.   Argument

The Ethridges move to compel the production of correspondence between Janet Hendrick and Wendy Dufresne (former CEO of PGS), regarding certification of PGS as a minority contractor. [154] at 2. They submit that the information sought is relevant, as part of their claim against Defendant Soignet for tortious interference with the PGS Agreement. *Id*. at 8. They point to the facts alleged in their counterclaim and also point to the deposition testimony of Ms. Dufresne, wherein Ms. Dufresne was questioned regarding her decision not to submit the Women-Owned Business Enterprise ("WBE") recertification for PGS. *Id*. Specifically, they refer to the following exchange between counsel for the Ethridges and Ms. Dufresne, and they argue that they are entitled to the letter referenced.

Q.   [N]ow I want to ask you some questions about the communication you received

4

|   |   |   |
|---|---|---|
|   |   | about the decision that you made not to send the certification for PGS to be a – to be recertified as a woman's – certified woman's diverse company. Okay? |
|   | A. | Uh-huh. (Affirmative response.) |
|   | Q. | Who did that communication – was that communication in written form? |
|   | A. | Yes. |
|   | Q. | Okay. Who did it come from? |
|   | A. | It came from someone who was supposedly a specialist. |
|   | Q. | A specialist? |
|   | A. | In that particular field of certifications. |
|   | Q. | Okay. Do you remember the name of whoever it was that sent it to you? |
|   | A. | The person that sent it to me was UCS's attorney. |
|   | Q. | Who is UCS's attorney that sent it to you? |
|   | A. | Janet. |
|   | Q. | Okay. So she sent – did she just send you a copy of the letter? |
|   | A. | Yes. |
|   | Q. | Okay. And that letter instructing you concerning your position as the CEO of PGS in connection with submitting or not submitting the recertification? |

MS. HENDRICK: I'm going to object on the basis of attorney/client privilege and instruct the witness not to answer.
BY MR. HEILMAN:
    Q.    Did the letter concern your business or your work as the CEO of PGS?
MS. HENDRICK: I'm going to object –
BY MR. HEILMAN:
    Q.    Not any specifics. Just did it instruct your work as the CEO of PGS only?
MS. HENDRICK: I'm going to object on the basis of attorney/client privilege and instruct the Witness not to answer.
BY MR. HEILMAN:

|   |   |   |
|---|---|---|
|   | Q. | What's – what's the basis of that objection? If she's working for PGS and she gets communication from Counsel concerning her work at PGS, PGS at that point in time is a company that's owned by four people as members. The majority member is sitting in this room. The business of PGS is her business at this point in time in terms of the majority ownership. Any communication concerning this company, PGS, is not privileged con - -- as to these people. |

MS. HENDRICK: I disagree. It was an attorney/client communication that was directed to advise Ms. Dufresne regarding recertification specifically.
BY MR. HEILMAN: And recert- --
MS. HENDRICK: I'm not going to – I'm not going to change my mind about the instruction --
BY MR. HEILMAN: That's okay.
MS. HENDRICK: -- instruction not to answer.
BY MR. HEILMAN: I just want a good record on what this is.
MS. HENDRICK: Okay.
BY MR. HEILMAN:
    Q.    And did that letter from UCS's lawyers, or did that letter on -- on the instructions, come from – from lawyers for PGS? I don't want the instructions. I just want to know where it came from.
MS. HENDRICK: It came from Counsel for PGS.

BY MR HEILMAN:
    Q:    Counsel for PGS?
MS. HENDRICK: Yes.
BY MR. HEILMAN:
    Q.    And who hired that Counsel?
MS. HENDRICK: I'm not going to answer any further questions about it.
BY MR. HEILMAN:
    Q.    Are you going to listen to your . . . Counsel's objection and . . . follow her instruction and not answer any more questions?
    A.    Yes.

Doc. [153-1] at 2-3, Excerpt from the videotaped Deposition of Wendy L. Dufresne, 68:13 – 72:20.

Following the deposition, the Ethridges' propounded a written discovery request to UCS, seeking production of "communications . . . received from any person, including counsel, which address certification or recertification of PGS . . . including . . . the letter sent by Janet Hendrick to Wendy Dufresne . . ., the attachments to the letter . . ." and other communications concerning decisions and actions for PGS. [154] at 9-10 (quoting portions of Request No. 16). In response to the request for production, UCS once again objected on the basis that the letter contained communications that are irrelevant, outside the scope of discovery, not properly tailored to the subject matter or issues in the case, subject to attorney-client privilege. Doc [154] at 9-10. UCS also provided a privilege log. *Id*. The Ethridges challenge UCS's refusal to produce the letter, as they contend good cause exists for production of the letter. *Id*.

The Ethridges argue that UCS has not met its burden to show the letter is protected by attorney-client privilege. *Id*. at 12. First, they contend that the letter at issue consisted of business advice, namely whether to move forward with submission of recertification for WBE status, which they say is nonlegal communication and not protected. *Id*. They also argue that even if the letter constitutes an attorney-client communication, the Ethridges were members of PGS at the time the letter was sent, so they should have been included on the subject communication addressing certification of WBE. *Id*. They note that PGS is a WBE by virtue of Cecily Ethridge's majority

6

membership. *Id*.

Second, they submit that at Ms. Dufresne's deposition, Ms. Hendrick represented that she acted as counsel for PGS, but she later stated she was not acting as counsel to PGS – but rather, she was acting as counsel to UCS – when the subject communication with Ms. Dufresne occurred. *Id*. at 11. The Ethridges contend the law is clear that "if Ms. Hendrick was acting as counsel to PGS in communications, no privilege protects the communications from the Ethridges, owners of PGS." *Id*. They say PGS, as the client, holds the privilege. *Id*. at 13 (citing to *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970) for the position that "in litigation between shareholders and the corporate entity, the corporation cannot assert the attorney-client privilege against its shareholders."). Movants also argue that if Ms. Hendrick was acting as counsel for UCS when she advised the CEO for PGS about recertification, no attorney-client privilege exists there either, because advising Ms. Dufresne how to proceed in official actions as an officer of PGS was based on her position as CEO and not for any position she held with UCS (a separate entity). *Id*. As such, the Ethridges argue Ms. Dufresne owed PGS a fiduciary duty of loyalty to act in the best interest of PGS, in determining whether to submit for recertification. *Id*. Yet again, the Ethridges argue this was business advice to PGS and therefore the privilege belongs to PGS. *Id*.

Finally, they contend as members of PGS, representing the majority of ownership shares, the Ethridges should be privy to the communication. *Id*. at 13. Thus, they say good cause exists to override any concerns about attorney-client privilege. *Id*. at 13-14. The Ethridges also note that they have no other way to access the letter, containing business advice, that ultimately resulted in PGS not being recertified as a WBE. *Id*. at 14. They move this Court to compel UCS to produce the letter and related communications, as set forth in their written discovery requests.

UCS opposes production of the information sought. Doc. [165], [166], Defendant's Motion

and Memorandum in Opposition. It asserts that the attorney-client privilege protects the communications at issue, which it submits are between counsel for UCS and officers of UCS, for the purpose of facilitating the provision of legal advice. [166] at 1. Plaintiff points out that although it asserted work product privilege over several of the communications sought by the Ethridges, they only seek to compel the subject communications. *Id*. Plaintiff also argues that the good cause standard is inapplicable here, because this is not a case between a corporation and its shareholders. *Id*. at 2. Rather, it is between the Ethridges – as former members of PGS – and UCS, a wholly separate entity. *Id*. In fact, it contends no exception applies to support disregarding the privilege. *Id*.

UCS notes that Ms. Dufresne is both the former CFO of UCS and the former CEO of PGS, and she held both of these positions when the communications at issue were exchanged. *Id*. at 2. UCS reiterates that the subject communications were exchanged with Soignet and Ms. Dufresne to "facilitate the provision of legal service to UCS." *Id*. In response to the Ethridges' request for production of the subject letter and all attachments to the letter, UCS objected on various grounds and also produced a privilege log identifying the related privileged emails. *Id*. at 2-3.

UCS challenges the Ethridges' "speculat[ion] that the communications are 'nonlegal communications based on business advice given by a lawyer.'" *Id*. at 4 (quoting Doc. [154] at 12). Further, it contends Ms. Hendrick was not tasked with providing business advice to UCS, rather as legal counsel, and each email communication between her and UCS officers was for the facilitation of legal advice or services. *Id*. (Citation omitted). Plaintiff relies on *Baptist Health v. BancorpSouth Ins. Servs., Inc.*, 270 F.R.D. 268, 273 (N.D. Miss. 2010), asserting that communication does not have to contain solely legal advice or analysis. *Id*.[2] UCS also cites to *Lott*

---

[2] The Court in *Baptist Health* held that documents related to healthcare service provider's information were subject to attorney-client privilege. Specifically, the Court noted that Mississippi Rule of Evidence "502 . . . does not demand

8

*v. AXA Equitable Life Insurance Company*, No. 1:18cv63-GHD-DAS, 2019 WL 2550323, at *1 (N.D. Miss. June 20, 2019), a case involving a motion to compel privileged documents, and it notes that UCS's privilege log demonstrates that each email at issue involves communications with Plaintiff's counsel as the sender or primary recipient. *Id*. Further, UCS argues that the communications relate to the issues relevant to this lawsuit and involve information received by counsel in her professional capacity and in the course of representation. *Id*. at 4-5. (Citation and internal quotation marks omitted). Plaintiff urges this Court to deny the amended motion to compel.

IV.  Analysis

    a. Standard

This discovery dispute concerns the scope of discovery and the procedure by which the parties may obtain discoverable information. This Court has broad discretion over both. *See Hernandez v. Causey*, 2020 WL 5412486, at *3 (S.D. Miss. Sept. 9, 2020) (quoting *Freeman v. United States*, 566 F.3d 326, 341 (5th Cir. 2009) ([i]t is well established that the scope of discovery is within the sound discretion of the trial court.")); See also *Saucier v. Lakeview Corp.*, 2014 WL 12906612, at *1 (S.D. Miss. Dec. 30, 2014) ("[a] district court has "broad discretion" to control the procedure for obtaining discoverable material.").

In reviewing a motion to compel, courts must consider that discovery rules "are to be accorded a broad and liberal treatment to effect their purpose of adequately informing litigants in civil trials." *Herbert v. Lando*, 441 U.S. 153, 177, 99 S. Ct. 1635, 60 L. Ed. 2d 115 (1979). "At some point, however, discovery yields diminishing returns, needlessly increases expenses, and delays the resolution of the parties' dispute." *Willis v. City of Hattiesburg*, No. 2:14-cv-89-KS-

---

that the communication solely contain legal analysis or advice; rather, privilege protection attaches to those communications that would facilitate the rendition of legal services or advice." (citation omitted)).

9

MTP, 2016 U.S. Dist. LEXIS 30985, 2016 WL 918038, at *2 (S.D. Miss. Mar. 10, 2016). Indeed, "[d]iscovery is not a license for the [parties] to 'go fishing' and is limited to information that 'is relevant to any party's claim or defense.'" *Barnes v. Tumlinson*, 597 Fed. App'x 798, 799 (5th Cir. 2015) (citing *Marshall v. Westinghouse Elec. Corp.*, 576 F.2d 588, 592 (5th Cir. 1978); Fed. R. Civ. P. 26(b)(1)). "Finding a just and appropriate balance in the discovery process" is thus one of the Court's key responsibilities. *Willis*, 2016 U.S. Dist. LEXIS 30985, 2016 WL 918038, at *2. Rule 26(b)(1) provides that information is within the scope of discovery if it is not privileged, is relevant, and proportional to the needs of the case:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). Meanwhile, Rule 26(c) empowers the Court to control the procedure for obtaining discoverable information. *Saucier*, 2014 WL 12906612, at *1. Finally, Rule 37 provides that "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond" and it authorizes the Court to issue an order compelling the production of such information. Fed. R. Civ. P. 37(a)(4).

    b. *Findings*

Defendants/Counter-Plaintiffs move the Court for an order compelling UCS to respond Request for Production No. 16, particularly through production of the subject letter and related communications. Plaintiff objects on the basis of attorney-client privilege. "In Mississippi, the attorney-client privilege is defined as the client's right to refuse to disclose and prevent others from disclosing confidential communications made for the purpose of facilitating the rendition of

10

professional legal services to the client. . . ." *Doherty v. Shelter Mut. Ins. Co.*, No. 2:19-CV-1-KS-MTP, 2020 WL 1867992, at *1 (S.D. Miss. Apr. 14, 2020) (quoting Miss. R. Evid. 502(d) (internal quotations omitted)). The purpose of the attorney-client privilege is to encourage full and frank communication between attorneys and their clients and thereby to promote broader public interests in the observance of law and administration of justice. *Id.* (Citations omitted).

The attorney-client privilege "was intended as a shield, not a sword." *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir.1989) (quoting *Pitney–Bowes, Inc. v. Mestre*, 86 F.R.D. 444, 446 (S.D.Fla.1980)). Essentially, each of the arguments advanced by the Ethridges serve as an attempt to establish that a waiver of the privilege occurred through the interrelatedness of the two companies and their overlapping officials, namely Ms. Dufresne, who served as both CEO to PGS and CFO to UCS. Waiver of privilege requires an affirmative act to put the advice of counsel at issue. *In re Itron, Inc.*, 883 F.3d 553, 569, n. 6 (5th Cir. 2018). UCS vehemently contests any such waiver of privilege. It has maintained – during the deposition of Ms. Dufresne, in response to the written request for production, and now in response to the amended motion to compel – the communications sought are protected by attorney-client privilege.

Of particular importance, the Ethridges acknowledge that "*if* Ms. Hendrick was acting as counsel to PGS in communications no privilege protects the communications from the Ethridges, owners of PGS." [154] at 11 (emphasis added). Yet, they say that Ms. Hendrick represented at the Dufresne deposition that she acted as counsel for PGS. Upon review and consultation with Judge Harris's Chambers, the undersigned finds that this statement is not entirely sound, as the Ethridges' are aware that Ms. Hendrick previously "clarified to Magistrate Judge Harris [during the June 4, 2025 discovery conference] that she was acting as counsel for UCS, not PGS." [166] at 4, n. 2. The Ethridges have made no showing that Ms. Hendrick's clarification is inaccurate or a

11

misrepresentation. Indeed, Judge Harris considered the parties' arguments regarding the Ethridges' *ore tenus* motion to compel, and he ultimately ordered Plaintiff to "produce an updated privilege log" as to the subject communications for which UCS asserted attorney-client privilege. *See* Minute Entry, dated 06/04/2025.

Upon consideration, the Court is not persuaded that the communications sought are nonlegal communications such that they are not subject to privilege, that good cause exists to overcome the asserted protection of the attorney-client privilege, or that the subject communications were not made to facilitate the rendition of legal services. While the undersigned appreciates the Ethridges' desire to inspect communications that they suspect provide insight into the decision not to recertify PGS as a WBE, the Court finds no permissible justification for breaching UCS's right to refuse disclosure of confidential communications with its counsel. While the communications sought are unquestionably relevant to the Ethridges' claims, the information is not proportionate to the needs of the case. Certainly, though the communications at issue ***may*** support the Ethridges' claim of tortious interference, the Court finds that an imbalance exists as to burden and benefit here.

The Ethridges assert that the subject communications go directly to the core of their counterclaims against UCS. However, they fail to make sufficient showing to compel production against UCS's assertion of attorney-client privilege. The Court has considered all arguments presented. Any argument not specifically addressed would not affect the outcome. The Amended Motion to Compel is hereby denied.

IT IS, THEREFORE, ORDERED that Defendants/Counter-Plaintiffs Richard Ethridge, II and Cecily LaRue Ethridge's Amended Motion to Compel [153] is hereby DENIED.

**SO ORDERED** this the 4th day of March, 2026.

/s/ LaKeysha Greer Isaac
UNITED STATES MAGISTRATE JUDGE